This next case is number 4-15-0214, Topflight Grain Cooperative, Inc. v. RJ Williams Farm, Inc. Appearing for the appellant is Attorney David Cox and for the appellee, Attorney Craig Unrath. Counsel, are you ready to proceed? I am ready. Alright, you may proceed. Counsel. Counsel. Good morning. My name is David Cox. I think I've been before all of you on this panel before on other cases. I represent RJW Williams Farms, Inc. This is a case involving Topflight Grain Cooperative, who is located in Monticello, Illinois, a grain elevator, and a farmer who farms in Piatt County and other counties. The dispute here is over a contract, whether or not it existed for the sale of 100,000 bushels of corn. It's been identified in the record as Contract 16-877. The central issue in this case is whether or not there was an agreement between these parties, and even more particular, if there was an agreement, does it contain an arbitration clause? Now, that requires deciding whether or not the trial court properly applied the Uniform Commercial Code to the determination of whether or not there was notice. Since there is not a signed contract in this case, one has to either apply the National Grain and Feed Association rules for contract formation, or one applies the Uniform Commercial Code on the issue of notice. And the trial court, for the most part, I want to stay on the issue of the notice as much as possible, but the trial court gave us very little insight as to the court's analysis. I have quoted the muck case from this district, asking courts to clarify their ruling. We really don't have a trial court determination on exactly whether or not there was proper notice in a lot of the elements of the agreement. It was rather cursory and conclusory. The trial court did specifically state, though, that the court was not going to be bound by the rules of a private association, being the National Grain and Feed Association, and the court was going to apply the UCC in the issue of notice. This is our primary issue on appeal, Your Honor. We believe that the National Grain and Feed Association rules apply both to contract formation and whether or not there was a contract, and of course Top Flight believes that the National Grain and Feed Association rules apply because they had those arbitration rules as a part of their form on the back of the contract, and of course they're asserting that the arbitration provision, if an agreement existed, compels the parties to proceed to arbitration over this dispute. Now the Uniform Commercial Code actually addresses the ability of parties to cooperate in terms of establishing notice. In Section 204, paragraph 1, it says, Whenever the Act, of course the Commercial Code, requires any action to be taken within a reasonable time, any time which is not manifestly unreasonable, may be fixed by agreement. So you have the UCC provision that says if there's no signature, you have to send a confirmation within a reasonable time, because so often these contracts or these orders are placed by phone, and that certainly is often the case with parties in a grain elevator. And if the National Grain and Feed Association rules apply, then the notice is much more constrained because it requires under Rule 3A, and I'll get to that in just a moment, Oh, I'm sorry. I didn't mean to interrupt you. No problem. You could just bookmark where you're at there. Yes, sir. I have a question in regards to the standard of review here. Yes, sir. When talking about contract formation, usually it's a question of fact for the trier fact to determine. Here, in terms of whether it was a contract under the NGFA rules or under the UCC, was something for the trial court to consider. So you've framed it as a de novo standard here in terms of which was appropriate for the trial court to utilize. Is that right? For the appellate court? A de novo standard for us? Yes, that's what I'm arguing, and perhaps I should have elaborated on that a moment ago when I was talking about Judge Fenton's decision. And if you could, during your argument, do that, because it seems like you make the preliminary argument that it's a de novo standard of review as to whether or not the NGFA rules should apply or the UCC should apply. But then you indicate that even if the UCC rules should apply, then perhaps under a manifest weight standard your client should have prevailed and no contract should have been found. Is that correct? I believe so, Your Honor. Our central argument, our primary argument on this appeal, is that the trial court erred in applying the UCC and not applying the National Grain and Feed Association rules. And because so often the de novo standard is applied to questions of law, which this court is well positioned to address, and because the trial court specifically stated it was going to reject the application of the National Grain and Feed Association rules, that's why we applied or argued that the de novo standard should be applied to this court's determination. If that argument fails and we have to fall back to the UCC and the reasonable notice, it would still be within the province of this court to determine whether or not that was the applicable law in lieu of the National Grain and Feed Association rules. And at that point, if we go back to whether or not notice was reasonable, whether the terms of the contract did include an arbitration clause, then I think we do fall back to the manifest wage standard in terms of whether or not the trial court erred in making a decision in light of the facts of the case. As I was stating a moment ago, we believe that the National Grain and Feed Association rules govern contract formation and the outcome of this dispute, particularly on the issue of reasonable notice. I already quoted the UCC provision that indicates the parties can set this by agreement, and indeed Top Flight believed that the National Grain and Feed Association rules would apply. We know from the facts that it's not disputed that Top Flight is a member of NGFA. In evidence is the booklet or the copy of the NGFA rules that were applicable at the time, and in the preamble it indicates that these rules will be applicable to contract formation and resolving disputes. If the court accepts Top Flight's testimony in terms of what was stamped, there is quite a bit of dispute at the trial court level in terms of what was on the back of these form contracts, what there were different versions that had different paragraphs and so forth. But if this court concludes to its satisfaction that the back of these contracts had standard conditions that were to be applied to the contract in this case if there was an agreement, then you can examine paragraph 11 according to Top Flight's testimony that indicates that the NGFA trade rules will apply on the date that this purchase contract is signed, and in paragraph 13 it says this contract shall be governed by and construed in accordance with the laws of the State of Illinois if the matter is not addressed by the NGFA trade rules. And here it is. If you go on from that point, NGFA rule 3A within their contract formation rules indicates that, and this would be in a situation where there is no written signature, there's no written contract that both parties sign and can verify and point to the circumstances where they were both meeting or returned the contract. In this type of a situation where there's a question about whether or not there was an agreement, rule 3A states that it's imperative to send a written confirmation that's required, quote, not later than the close of the business day following the date of trade, unquote. Now if you apply that to the facts of this case, what you have, while I suppose many of the facts are in dispute, you still have Top Flight testifying that on March 3rd, they visited Mr. Williams' house, who is the head of RJW Williams Farms, and reached an agreement on 16-877 according to Top Flight, just accepting their assertion for the sake of argument. They returned to the office, they testified that Adam Jackson basically typed the terms into the contract, stamped something out with or without provisions on the back. Their testimony indicates that there were some standard provisions on the back, many of which I've referred to today. And so the requirement would have been, under the UCC, if the agreement was reached on the 3rd, then they were, I'm sorry, under rule 3A, I misspoke, forgive me. The requirement under 3A would require Top Flight to send a confirmation no later than the end of the next business day, which would have been March 4th. Now Top Flight asserts that it did so, but I think if the court examines fairly closely the language in terms of the testimony at trial about mailing the document or the alleged contract, I think the court will find that it likely falls short. For example, in the record, volume 8, page 104, this is Mr. Broon testifying, who is one of the managers for Top Flight. And I know you don't want an elaborate quote, so I'll just kind of skip through it real quick, because I understand that you're well prepared and will have read this. But to refresh your memory, basically indicates that he mailed this document along with 36280, they were both printed off, I combined it with 36280, put it in a window envelope in the address showing, put the postage on it, and mailed it out. Put it on a desk for the U.S. Postal Service to pick up. Now that's where we believe the evidence fails to establish that under the NGFA Rule 3A, there was a notice sent by the end of the next business day. But what the testimony does not establish is what time of day it was, that there was any certainty in the post office picking it up off that desk. It doesn't establish any extrinsic procedure that would indicate that it was going to be mailed. Now, Top Flight quoted two cases that asserted that if you can establish as a regular business practice, this is what we do to mail it, we followed it in this case, then it may be sufficient. But I think both of those cases fail to be applicable precedent to this particular situation. In other words, the standard is, if you can show that you have a regular procedure for mailing and you follow that regular procedure, that it may be sufficient to show that you mailed out the notice, as long as there's some kind of corroborating evidence to establish the fact that custom was followed. And that's what you see in Tabor and the Owl case, which were asserted by Top Flight. In Tabor, there wasn't just an assertion that the notice had been mailed. There were other actions taken. The secretary would fill out a proper information and place the confirmation in a window. Two copies would be mailed. Again, I don't want to go too far into this process, but essentially one would be mailed to their Decatur office. I'm sorry. Didn't RJW personally perform its contract under number 36280? They did. Okay. And the notice, at least the testimony was, the notice for 16877 was mailed in the same envelope with 36280. I believe there were independent discussions on March 7 regarding 36280, and 83,000 bushels of grain had been delivered as partial performance on 36280. So I think that's one of the reasons there wasn't a dispute on 36280. Well, I guess what I'm getting at, isn't that some corroboration of the fact that the notice that was sent was received? No, of course that wasn't the issue at trial here, but from my client's perspective there were other conversations that confirmed 36280. You notice it's not in the sequence of numbers as you would normally number contracts as you were proceeding through grain agreements. So my client never denied the existence of 36280 as far as I knew, and there were other conversations that confirmed the agreements. He certainly didn't receive it. There's no evidence that he received a notice on 36280, but some of these other conversations, either at the grain elevator or at his home, confirmed that that exists. Wasn't 16877 originally part of a larger contract, double the size of this one? It was, absolutely. In June 2010 there was a 200,000 bushel contract. Right, and your client asked to be able to deliver directly to ADM, didn't they? On the first part of the 16877? It was 100, they broke it into two, 100,000. That's top flight testimony, right, that 100,000 succeeded in 16877 and another part of it went to 36280. And I believe it was the part that went to 36280 that Mr. Williams asked for and received permission to deliver to ADM, and that's where we get the 83 out of the 100,000 bushels, even according to top flight's testimony. Anyway, on Tabor, there was other corroborating evidence in the case that would indicate there were copies that were sent to the Decatur office, there were notes made, other records in-house, there were other copies made at the mailing, and other ways to document that the process had been followed rather than testimony four or five years later to basically say this is the way we mail things and this is the way we did it on this occasion. In the Owl case, same thing. They created a carbon copy of the mailing, a certificate of mailing, and a photo of the notice and a cancellation to the third party. Now that's other corroborating evidence that shows here's a record. How hard would it have been to have a record that says we logged this notice, we have a copy of it, and we did this procedure in-house to send Mr. Williams a confirmation? They didn't do that. Now I realize the certificate of service in the sense that we use as counsel isn't directly applicable to this case, but imagine if I could do a certificate of service serving a document on somebody that said on this date I put it in an envelope and I placed it on a desk where the U.S. Post Office normally picks it up. That would be inadequate, and I think it's inadequate under the National Grain and Food Association rules unless there's some other evidence or record that would establish that they were following their own procedure. Again, one of the major problems, even if you accept all of their testimony as accurate, is we don't know what time of day it was. Was it 9 o'clock? Was it 3 p.m.? Had the Post Office already sent somebody for the day? You have to take a leap of faith for that envelope to leave the desk not only that day, but even if you apply the UCC rules at any time in the future without any corroborating evidence to indicate how the envelope was handled. I understand the argument that you're making that the evidentiary basis was insufficient for the trial court to be able to draw the inference that it was in fact mailed. In your reply brief, you state Mr. Williams never received the confirmation. My question for you is, was there evidence presented of that? In other words, Mr. Williams didn't testify? He did not. Okay. Is there evidence in the record indicating he did not receive the confirmation? Well, Tom Flight certainly can't testify. You may recall at this court that we made a motion for a directed verdict and there was no evidence after that when the court denied the directed verdict in favor of RJW. But certainly Tom Flight was not in a position and therefore there's nothing in the record that would indicate that they could confirm that Mr. Williams received the notice. And there's no evidence in the record that he did not receive it. Is that correct? That's true. Okay. I have completed my argument on this matter. Do you have any more questions or shall I be seated for the moment? All right. I don't see any other questions. Thank you. All right. Thank you. Counsel? Thank you, Your Honor. My name is Craig Unrath. I represent Tom Flight, counsel. On March 3, 2011, the general manager of Tom Flight, Scott Dougherty, met with James Williams to discuss open contracts from the prior year. These are large contracts. We're talking 200,000 bushels of corn. Now, they handed him an acknowledgment, confirmation that these contracts existed. He never denied it. He understood the situation. He understood his obligations under those contracts were $200,000, 200,000 bushels. But he couldn't fulfill the contracts. He needed a break. He basically needed a favor. So they worked out a deal. We're going to split the 200,000 bushel contracts into two contracts, one deliverable directly to ADM, the other deliverable to Tom Flight in May 2011. Now, the following day, they printed off the contract, signed it, placed it in an envelope with the Williams address showing, a fixed postage, and placed it on the chief financial officer's desk, which is the central point in which the U.S. Postal Service picks up the mail on a daily basis. So, counsel, what is the evidence that corroborates that? The evidence that corroborates it is actually fairly extensive. Number one, as Justice Harris pointed out, there is no evidence in the record, none, that he did not receive this confirmation. At no point did Mr. Williams testify, I never received it. Now, that's very strong evidence right there. We also have the fact that the letter was never returned undeliverable. We have the fact that Williams, the following business day, the confirmation was mailed on Friday the 4th, the following business day they visited him personally and handed him the contract, and he never objected to it. That's another corroborating aspect. They met with, they then sent him a fax of the contract a week or so later. We have proof that the fax was received. There is a personal visit, I believe it occurred in April, where they discussed the contract. And then finally, we have a letter from Mr. Williams on April 29th saying, I intend to fulfill this contract, but I need a little bit more time. I need a break. I need another favor. Give me a little bit more time. And they gave him a little bit more time. But, of course, he never delivered on that contract. And now he's before this court asking for one more favor. He's asking that this contract disappear. He's asking that he doesn't own anything, that this 100,000 bushels of corn never existed. It's unenforceable. And I think from just a basic fairness and justice aspect, I find that upsetting. Now, there was some discussion here about whether this issue is governed under the NGFA rules or under the Illinois statutes, the Uniform Commercial Code and Illinois common law. The party to this contract never adopted the NGFA rules as a means of constructing and interpreting the contract. The question here is whether the contract is enforceable under Illinois law. And if so, then under the terms of the contract, it must be arbitrated to the NGFA. A question in that regard. I understand that if it's a matter of enforceability, then we're looking at it as a question of law for an overall review. When it comes to contract formation, you could have a fact question. Did the parties agree to be bound by this set of rules versus this set of rules? And that then would be a question that's subject to the manifest weight standard, potentially. Here we're talking about contract formation as opposed to enforceability on that issue of which set of rules applies. Is that right, or am I incorrect about that? This contract does not incorporate the rules of the NGFA. All it does is that it requires that if the contract is found enforceable,  if it is found enforceable, then under the terms of the contract, any disputes arising under this contract must be ruled upon or arbitrated to the NGFA. But Mr. Cox is arguing there was no contract formed under the NGFA rules, so it seems like we have to first consider was there a contract formed, and we have to then look at both the ECC and the NGFA and make a determination as to which set of rules would apply for contract formation before you get to enforceability. I agree that we have to discuss contract formation initially. However, as I mentioned earlier, there is no term in this contract that says that the enforceability of this contract, that the formation of this contract is based on NGFA rules. The contract merely states that if we have an enforceable contract, then the NGFA rules come into play. Then we go to arbitrate. Then we determine under NGFA rules whether confirmation was sufficient, whether it was done within a reasonable period of time. Now, this case is determined entirely under the Uniform Commercial Code and Illinois Common Law as to the formation of contracts. Under the UCC, we are required to give confirmation of the contract within a reasonable period of time. We did so. Our proof that a confirmation is properly filled out, together with evidence of an office custom and practice as to mailing, is sufficient proof of mailing when there is corroborating evidence to establish that the custom was followed. Now, that's the rule of law that applies here. Counsel brought up the Tabor decision. The Tabor decision points out that that's the rule, but it's a rebuttable presumption. And if it's rebuttable, then it's determined by the trier of fact. That's where we go to the trial judge. We had a bench trial. The trier of fact determined as a matter of issue of fact that confirmation was sent within a reasonable period of time. And that ruling can only be reviewed under the manifest weight standard. Now, under that standard, I think we all know that standard is extremely high. This court can overturn that factual determination if it finds the judge's ruling to be completely unreasonable or arbitrary or not based on the evidence. And quite frankly, I do not believe that you can possibly construe the trial court's ruling as to timely confirmation as being arbitrary. We have Judge Cope. You pointed out the fact that both of these confirmations were sent in the same envelope, and yet we have Mr. Williams acted on the first contract and never delivered on the second. We have the fact that he never objected at any time, even though the following business day after that confirmation was mailed, he never objected. He never objected at any point until after the time limit for performing on the contract had been expired. This case cannot be determined under any rule of law other than Illinois common law and Illinois statutory law under the Uniform Commercial Code. To say otherwise is basically to ignore the basic terms of the contract. I have no further comments. If the court has no questions. I don't see any. Thank you very much. We ask that you affirm. Thank you, Mr. Honrad. Mr. Cox, rebuttal. Extremely briefly. First of all, I don't see how Top Flight can assert a position where they invoke the National Green and Feed Association rules or don't invoke them depending on what's convenient in the light of the facts of their case. There is no way to construe 3A other than a contract formation rule, and that contract formation rule in a situation that applies to its members and sets up this whole ability to reach an agreement without a written signature that may or may not include an arbitration provision. Since you have to send notice if there's no written signature by the close of the next business day, there's no way to construe that anyway other than as a contract formation rule. So I would argue that the court should reject this desire by Top Flight to weave in and out of the National Green and Feed Association rules. And quite frankly, and I mean no respect to the trial court judge, I've practiced with him for a very long time and have a great respect for him. Is that no disrespect? Pardon me? You said you mean no respect. No disrespect. Excuse me. Just a little nervous. Thanks for clarifying. I'm sure you didn't want to say that. If he's listening to these recordings, I could be in real trouble. You have no choice, even under the manifest weight standard, but to construe his decision and try to envision what he was thinking when he made these conclusive restatements. Counsel says you can't construe the trial court's decision. You don't have any choice. We have about 60 words that basically say there was an agreement. It doesn't address the issue of notice. It doesn't provide any rationale. It doesn't provide any rationale for why the UCC should apply rather than National Green rules. For the factual determinations, it would be necessary to establish that there was an agreement and to establish that there was an arbitration clause. Even under the manifest weight standard, you have been given very little information or analysis. Despite your own rulings, the court should provide some explanation. So with all due respect to Judge Fenson, I think that this court has no choice but to review it, even on the factual determinations, and see if the court concurs that the conclusion makes sense. If there are no further questions, I complete my remarks, and I thank you for your time. We're asking, of course, for the court to reverse the trial court on this decision. All right. Thank you, counsel. Thank you both. The case will be taken under advisement and a written decision shall issue.